IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JULIE K. THURSTON

       Plaintiff,

  vs.                                  Civil Action 2:11-CV-204
                                        Judge Smith
                                        Magistrate Judge King

**MICHAEL J. ASTRUE, Commissioner**
**of Social Security,**

       Defendant.

### REPORT AND RECOMMENDATION

This is an action instituted under the provisions of 42 U.S.C. §405(g) and 1383(c) for review of a final decision of the Commissioner of Social Security denying plaintiff's applications for disability insurance benefits and supplemental security income. This matter is now before the Court on plaintiff's *Statement of Specific Errors*, Doc. No. 15, and the Commissioner's *Memorandum in Opposition*, Doc. No. 20.

Plaintiff Julie K. Thurston filed her applications for benefits in June 2007, alleging that she has been disabled since February 27, 2005 due to narcolepsy, neck pain, back pain, flat feet and kidney infections. *Page ID#* 241. The applications were denied initially and upon reconsideration, and plaintiff requested a *de novo* hearing before an administrative law judge.

On February 4, 2010, plaintiff, represented by counsel, appeared and testified at a video hearing as did Daniel W. Hammell, Ph.D., who testified as a medical expert and Patricia A. Cowen, who testified as a vocational expert. In a decision dated March 26, 2010, the administrative law judge concluded that plaintiff was not disabled within the meaning of the Social Security Act. That decision became the final decision of the Commissioner when the Appeals Council denied review on January 4, 2011.

Plaintiff was 41 years old at the time the administrative law judge issued her decision. *Page ID##* 68, 236. She has a high school education, *Page ID#* 246, and prior relevant work experience as a factory worker, telephone collector, traffic controller and waitress. *Page ID##* 242, 267.

Plaintiff testified at the administrative hearing[1] that she last worked on a factory assembly line from October 1995 to February 2005. *Page ID#* 85. She was on her feet most of the day and was required to lift from 10 to 85 pounds. *Id.* She also performed office work keeping track of warehouse inventory and maintaining contact with buyers and sellers. *Page ID#* 86, 87. She missed work because she could not wake herself up in time to get to work; she also fell asleep at work three to four times per week. *Page ID##* 89-90. Plaintiff recounted one instance where she fell asleep loading a skid and boxes fell on the person behind her. *Page ID#* 90.

Plaintiff has treated with Maureen Delphia, M.D., for sleep issues since August 2003. Plaintiff continues to see Dr. Delphia about twice a year. *Page ID#* 90. At the time of the administrative hearing, plaintiff was taking 100 milligrams of Ritalin per day; she nevertheless continued to occasionally experience sleep attacks during the day. *Id.* The medication works on some days but not on other days. *Page ID#* 94. She also experiences night sweats, night fevers and hallucinations. *Page ID#* 91. She does not drive unless it is absolutely necessary. *Id.*

Plaintiff testified that she also suffers panic attacks; she gets very nervous in crowds. *Page ID#* 92. She sought mental health treatment at Scioto Paint Valley Mental Health Center but testified

---

[1] Because resolution of the issues presented in this case do not turn on the vocational expert testimony, the Court will not summarize the vocational expert testimony presented at the administrative hearing.

that she was turned away because of a three to six month wait list. *Page ID#* 95.

Plaintiff also complained of repeated kidney infections, which cause muscles cramps and extreme fatigue. *Page ID#* 96. Her medications cause drowsiness and nausea. *Page ID#* 93.

On a typical day, plaintiff does light house work and checks the mail. *Page ID#* 96. She relies on her 16 year-old daughter for help with cooking and laundry. *Id.* Her nephews help with yard work. *Id.* She cannot be on her feet for long periods of time. *Id.* She has no prior warning of a sleep attack. She testified that she has wrecked her car multiple times because she has fallen asleep while driving. *Page ID#* 99. She also reads, watches television, or does a crossword puzzle, but her sleep issues caused difficulty with these activities. *Id.*

An October 2003 a sleep study ordered by Dr. Delphia was abnormal and consistent with narcolepsy. *Page ID#* 476-79. According to Dr. Delphia, plaintiff had difficulty staying awake even between naps; even on naps three and four she fell asleep immediately. *Id.* Dr. Delphia advised plaintiff to get adequate sleep at night and to avoid heavy meals. She prescribed a stimulant, Provigil. *Id.* On November 26, 2003, plaintiff reported that she was "sleeping better" and was "more alert during the day." Dr. Delphia also prescribed Ritalin and noted that plaintiff would return to work the following week. *Page ID#* 492.

In April 2005, plaintiff told Dr. Delphia that, although her Ritalin (20 mg 4 times per day) kept her awake, she still had difficulty waking in the morning for work. Dr. Delphia authorized a 2 month excuse from work in order to adjust plaintiff's sleep schedule. *Page ID#* 471.

In October 2005, plaintiff reported that she had lost her job because of continuous tardiness. Dr. Delphia adjusted

3

plaintiff's medication, *Page ID#* 487, but plaintiff later reported that she preferred Ritalin. *Id.*

On July 31, 2006, Dr. Delphia commented that plaintiff was still unable to work and that her narcolepsy was permanent. *Page ID#* 487.

On October 5, 2006, Dr. Delphia commented that plaintiff claimed that she had lost her job due to her use of medication, "even though this medication would not negatively affect her work." *Page ID#* 486.

On April 19, 2007, Dr. Delphia noted that, on some days, plaintiff took less than the prescribed dose of 20 mg of Ritalin up to four times per day and napped during the day instead. Dr. Delphia also commented that plaintiff cannot stay awake without some type of stimulant. *Page ID#* 485.

Consulting psychologist Marc Miller, Ph.D., examined plaintiff on August 9, 2007. Plaintiff reported difficulty being around crowds and did not like to leave home. Her daughter helped her with household chores, and her mother did her grocery shopping. Plaintiff appeared very anxious and her attention span and concentration appeared to be impaired. Dr. Miller characterized plaintiff's depression level as 7 out of 10 and her anxiety level as 8 out of 10. According to Dr. Miller, plaintiff experiences panic attacks with symptoms of sweating, dizziness, hyperventilation, chest tightness and tachycardia. Plaintiff exhibits agoraphobia and has periods of irritability. Dr. Miller estimated plaintiff's intellectual functioning to fall within the low average range; she had some difficulty with short term recall. Dr. Miller opined that plaintiff was not impaired in her ability to understand, remember, and carry out one and two step instructions; she was moderately to markedly impaired in her ability to interact with co-workers, supervisors, and the public due to her anxiety, depression, and panic attacks; she was moderately limited in her

4

ability to maintain attention and concentration due to anxiety; she was moderately to markedly impaired in her ability to deal with stress and pressure in a work setting due to her panic disorder; and she was moderately impaired in her ability to persist at tasks. Dr. Miller assigned plaintiff a Global Assessment of Functioning ("GAF") score of 50 in relation to her symptoms of depression, anxiety, and panic disorder and assigned a GAF score of 45 with respect to her level of current functioning. *Page ID##* 393-96.

On August 27, 2007, state agency psychologist, Carl Tishler, Ph.D., reviewed the file and concluded that plaintiff had no limitations with respect to understanding and moderate limitations in her ability to relate to others, to sustain concentration and pace and to handle stress. *Page ID#* 355. Plaintiff had moderate difficulties in maintaining social functioning. *Page ID#* 367. State agency psychologist Karen Stailey-Steiger, Ph.D., affirmed Dr. Tishler's assessment in December 2007. *Page ID#* 429.

State agency physician Eli Perencevich, D.O., reviewed the file in September 2007. *Page ID##* 397-404. According to Dr. Perencevich, plaintiff had no exertional limitations, but should avoid commercial driving and exposure to unprotected heights and hazards. *Page ID#* 398, 401. In February 2008, state agency physician Leslie Green, M.D., affirmed Dr. Perencevich's assessment. *Page ID#* 495.

On October 17, 2007, Dr. Delphia reported that plaintiff was prescribed Ritalin up to four times per day but that plaintiff complained that, on some days, that was not enough. Dr. Delphia instructed plaintiff to get adequate sleep at night and to take daytime naps whenever possible. *Page ID#* 466.

Plaintiff began seeing psychiatrist Brad Berger, M.D., at Adena Health System ("Adena") in January 2008 for stress and anxiety. Plaintiff had not undergone any previous mental health

treatment. Dr. Berger diagnosed anxiety for which he prescribed medication. *Page ID##* 513-15. In March 2008, plaintiff reported that her anxiety was a little better and that Valium worked "very well" when she went out shopping. *Page ID#* 511.

The record also contains treatment notes of Certified Nurse Practitioner ("CNP") Melanie Perkins-Graham of Pickaway Health Services, from February 5, 2008 through November 4, 2009. *Page ID##* 528-33, 557-61, 591-93, 600. Plaintiff was initially seen for hip pain and anxiety. *Page ID#* 531. Plaintiff's medications included Ritalin, Xanax, Valium, and Cymbalta. *Page ID#* 532.

When seen by Dr. Delphia on April 16, 2008, Dr. Delphia reported that plaintiff was "using Ritalin 20 mg four times per day and this does seem to work. There are days that she will take a little less." Dr. Delphia also reported that plaintiff was also treating with a psychiatrist. *Page ID#* 518.

That same month, Dr. Berger noted that plaintiff was "less anxious" on a higher dose of Cymbalta and had a full affect. Plaintiff reported that her lawyer "told her to try for psych disability [because it was] hard to get medical [disability]." She took Valium on an as-needed basis, and sometimes took only half a pill. *Page ID#* 509.

On May 9, 2008, Dr. Delphia opined that plaintiff is unable to work due to the severity of her narcolepsy. Dr. Delphia further commented that there is no cure for narcolepsy and that plaintiff's diagnosis is permanent. *Page ID#* 517.

On May 12, 2008, plaintiff presented to an emergency room with back pain diagnosed as lumbosacral strain. She was prescribed Vicodin and Flexeril. *Page ID##* 541-43. Plaintiff was seen for emergency room follow-up with CNP Perkins-Graham at Pickaway Health Services on May 20, 2008. CNP Perkins-Graham diagnosed lumbar strain and continued plaintiff's medication. *Page ID#* 529.

When seen by Dr. Berger, her treating psychiatrist, on May 27, 2008, plaintiff reported more stress. She had stopped her Cymbalta because of the pain medication prescribed by emergency room personnel. According to Dr. Berger, plaintiff's affect was mildly restricted and her anxiety was worse due to pain and financial issues. He lowered plaintiff's Cymbalta dosage. *Page ID#* 548.

In July 2008, plaintiff reported that she was doing about the same. Dr. Berger noted that plaintiff "tends to be very somatic and it is interesting that a decongestant is helping w/histaminergic issues." *Page ID#* 547. In October 2008, plaintiff reported having more panic attacks lately, possibly because of her upcoming disability hearing. She noted that her Valium did not help as much as before. She had no suicidal ideation and a full, mildly blunted affect. Dr. Berger increased her Cymbalta and Valium dosages. *Page ID#* 546.

When following up with Dr. Delphia on October 15, 2008, plaintiff noted that her mental health treatment was "going well." She took Cymbalta and Valium as needed. *Page ID#* 579.

On December 4, 2008, plaintiff was examined by Dr. Palmer at Pickaway Health Services. He noted that plaintiff was being treated at their office for depression, panic attacks and narcolepsy. Plaintiff reported that the combination of Ritalin, Cymbalta, and Valium was "working well." He diagnosed depression, generalized anxiety disorder and panic attacks and refilled her prescriptions for Ritalin, Valium, and Cymbalta. Dr. Palmer also suggested other methods for reducing her anxiety, including meditation and exercise. *Page ID#* 560.

On February 12, 2009, plaintiff consulted with a urologist regarding recurrent urinary tract infections. The urologist diagnosed a left solitary kidney, history of urinary tract infection and nocturia. *Page ID##* 572-74.

On March 19, 2009, Dr. Delphia completed a sleep disorders residual functional capacity questionnaire. *Page ID##* 580-83. Dr. Delphia reported that she has treated plaintiff for narcolepsy since October 17, 2003 and sees her approximately 2-3 times per year. *Page ID#* 580. According to Dr. Delphia, plaintiff suffers from excessive daytime sleepiness with recurrent daytime sleep attacks that can occur suddenly and in hazardous conditions. *Id.* According to Dr. Delphia, should plaintiff experience a sleep attack while working, it would likely disrupt the work of coworkers and supervisors in the vicinity. *Id.* Dr. Delphia reported that plaintiff would be unable to perform routine repetitive tasks at a consistent pace or detailed, complicated tasks. *Page ID#* 581. Plaintiff should not be exposed to strict deadlines or hazards such as heights or moving machinery. *Id.* Public contact and close interaction with coworkers and supervisors would not be a problem. Plaintiff's medications would not affect her ability to work. *Id.* According to Dr. Delphia, plaintiff can sit from 15 minutes to an hour and stand from 20 minutes to an hour. *Id.* Plaintiff can sit, stand or walk less than 2 hours in an 8 hour workday with normal breaks. *Page ID#* 582. Plaintiff would need to take unscheduled breaks more than 10 times in an average workday for at least an hour at a time because of her daytime sleep attacks. *Id.* Dr. Delphia opined that plaintiff should avoid concentrated or even moderate exposure to heights, dangerous machinery, power tools and routine, repetitive tasks. *Id.* Dr. Delphia also opined that plaintiff would miss an average of more than five days of work a month as a result of her narcolepsy. *Page ID#* 583.

On April 15, 2009, Dr. Delphia noted that plaintiff was taking 10 mg of Ritalin five times per day, "and this does seem to help with daytime alertness." *Page ID#* 599.

Plaintiff was seen on September 16, 2009, by a kidney specialist, Dr. Orinilikwe, for followup of her chronic kidney

disease status post right nephrectomy secondary to recurrent infection. Dr. Orinilikwe noted that plaintiff had been doing fairly well since March 2009. Urinalysis and culture did not show an infection. A CAT scan was essentially normal. Plaintiff had no complaints of chest pain, shortness of breath or any lower extremity edema or urinary symptoms. *Page ID## 596-97.*

On September 30, 2009, plaintiff was evaluated at Scioto Paint Valley Mental Health Center for an anxiety disorder and depression. Plaintiff reported having nightmares even during the day. She was oriented to time, person and place; she exhibited an appropriate affect; she reported "fair" sleep; she exhibited a cooperative and helpful attitude and denied suicidal ideation or past attempts. Plaintiff assessed her depression as "5" at the beginning of the appointment, but "1" at the end of the appointment. Plaintiff was diagnosed with a depressive disorder, an anxiety disorder a panic disorder with agoraphobia and a bipolar disorder. Her current GAF score was 53. The intake counselor, Nadyne McAdams, concluded that plaintiff's problems were mild and that she did not meet the agency's criteria for a psychiatric referral. *Page ID## 604-09.*

On October 14, 2009, Dr. Delphia reported that "Ritalin [was] still working" and that plaintiff should continue with 20 mg of Ritalin up to five times per day. *Page ID# 598.*

On October 28, 2009, plaintiff was seen by Nadyne McAdams, PCC, at Scioto Paint Valley Mental Health Center. Although plaintiff reported that other doctors had suggested that she pursue psychiatric treatment, Ms. McAdams explained to plaintiff that she did not meet the agency's criteria for psychiatric referral. Plaintiff denied suicidal or homicidal ideation and hallucinations. Ms. McAdams noted that the session ended early due to plaintiff's yawning and appearing tired. *Page ID# 602.*

9

Daniel Hammel, Ph.D., testified as the medical expert at the administrative hearing. Dr. Hammel testified that plaintiff's mental impairments did not, either individually or in combination, meet or equal a listing. *Page ID##* 100-01. In discussing the GAF scores reflected in the record, Dr. Hammel testified that a "GAF score alone tells you almost nothing" and that it had to be considered along with the nature of the disorder. *Page ID#* 112. However, he indicated that a GAF score in the 30s and low 40s might warrant close consideration of a marked impairment. *Page ID##* 111-12.

Dr. Hammel testified that, based on plaintiff's documented psychological impairments, her activities of daily living would be mildly impaired and her persistence/concentration would be moderately impaired. *Page ID#* 102. Dr. Hammel opined that plaintiff should not be exposed to the stresses of detailed or complex work, should have only occasional contact with the general public and should not perform line-pace work. *Id.*

Based on the above evidence, the administrative law judge found that, although plaintiff suffers from the severe impairments of stage III chronic kidney disease, status post right nephrectomy, narcolepsy, generalized anxiety disorder, panic disorder with agoraphobia and mood disorder, she nevertheless has the residual functional capacity to perform the exertional demands of a wide range of light work, *i.e.*, work that is generally performed while standing/walking frequently (approximately six hours in an eight-hour workday) and which requires lifting no more than twenty pounds occasionally and ten pounds frequently. *See* 20 C.F.R. §§ 404.1567(b); 416.967(b). The administrative law judge further found that plaintiff's residual functional capacity is further reduced by the following limitations: she should have not more than occasional contact with coworkers and supervisors; she should not work at unprotected heights or around dangerous machinery; she should not

drive; she should never climb ropes, ladders or scaffolds; she should not engage in work involving complex or detailed tasks; she should have only occasional contact with the general public; she should not be required to perform forced or assembly line paced work. Relying on the testimony of the vocational expert, the administrative law judge next found that there are jobs that exist in significant numbers in the national economy that plaintiff can perform. Accordingly, the administrative law judge concluded that plaintiff is not disabled within the meaning of the Social Security Act. *Page ID## 59-69.*

Pursuant to 42 U.S.C. §405(g), judicial review of the Commissioner's decision is limited to determining whether the findings of the administrative law judge are supported by substantial evidence and employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389 (1971); *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003); *Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). This Court does not try the case *de novo*, nor does it resolve conflicts in the evidence or questions of credibility. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

In determining the existence of substantial evidence, this Court must examine the administrative record as a whole. *Kirk*, 667 F.2d at 536. If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if this Court would decide the matter differently, *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028 (6th Cir. 1990)(citing *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983)), and even if

substantial evidence also supports the opposite conclusion. *Longworth*, 402 F.3d at 595.

In her *Statement of Errors*, plaintiff contends that the administrative law judge failed to accord appropriate weight to the opinions of Dr. Delphia, plaintiff's treating physician who has diagnosed narcolepsy and who has prescribed medication for plaintiff. *See, e.g.*, *Page ID##* 466, 478-79, 485, 487, 493, 517-18, 583, 598-99.

If the administrative law judge chooses to reject the opinion of a treating physician, he must give "good reasons" for the weight given to the opinion of that treating source. *See Blakley v. Commissioner of Social Security,* 581 F.3d 399, 406 (6th Cir. 2009); *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 545 (6th Cir. 2004). *See also* 20 C.F.R. §§404.1527(d)(2), 416.927(d)(2). In meeting this standard, the administrative law judge must consider certain factors, specifically "the length of the treatment relationship and the frequency of the examination, and the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source." *Id*. The administrative law judge's reasons must also be based on evidence in the record and be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating sources medical opinion and the reasons for that weight." *Id*.

The administrative law judge in this case rejected Dr. Delphia's March 2009 extremely restrictive residual functional capacity assessment, *Page ID##* 580-83, as "internally inconsistent with her own findings." *Page ID#* 67. For example, Dr. Delphia's treatment notes indicated that "Ritalin 20 mg four times per day does seem to work." *Page ID##* 67, 518. In 2003, Dr. Delphia's treatment notes reflect plaintiff's report that she was sleeping

12

better" and was "more alert during the day." *Page ID#* 473. *See also Page ID##* 471-72, 598-99.

The administrative law judge further found that Dr. Delphia's opinion that plaintiff would have no restriction on driving was inconsistent with her opinion of "recurrent daytime sleep attacks" caused by plaintiff's narcolepsy. *Page ID##* 67, 582.

Although Dr. Delphia repeatedly confirmed that plaintiff's narcolepsy is permanent, *e.g*, *Page ID##* 487, 583, a treating physician's diagnosis is not by itself determinative of the ultimate disability determination or of the limitations that result from the diagnosis. *See Simons v. Barnhart*, 114 Fed. Appx. 727, 733-34 (6th Cir. 2004); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition"). This Court concludes that the administrative law judge's assessment of Dr. Delphia's opinions enjoy substantial support in the record.

Plaintiff next argues that the administrative law judge failed to properly assess her psychological limitations. Specifically, plaintiff contends that the administrative law judge erred in rejecting Dr. Miller's GAF scores. *Statement of Specific Errors*, Doc. No. 15 at 18. A GAF score of 50, which Dr. Miller assigned plaintiff, *Page ID#* 395, indicates serious symptoms or serious impairment in social, occupational or educational functioning. *See* <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 34 (4th ed. text. rev. 2000). However, the administrative law judge was not bound by Dr. Miller's GAF score when reaching her findings regarding plaintiff's residual functional capacity. As the Sixth Circuit noted in *Denton v. Astrue*, 596 F.3d 419, 425 (6th Cir. 2010), "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF." (*citing Wilkins v. Barnhart*, 69 Fed. Appx. 775, 780 (7th Cir. 2003).

13

Indeed, the Sixth Circuit observed that "the [GAF] score does not reflect the clinician's opinion of functional capacity." *Id.* Thus, the administrative law judge in this case did not err finding a residual functional capacity not based on Dr. Miller's GAF score. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy. Thus, the administrative law judge's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate."). The administrative law judge rejected Dr. Miller's GAF score of 45 because that score related to "only the previous week prior [sic] to the examination. . . ." *Page ID*# 67. Instead, the administrative law judge found that the opinions of the state agency reviewing psychologists and of the psychological expert, Dr. Hammel were more consistent with the evidenced of record. The Court concludes that the administrative law judge did not err in this regard.

In short, the Court has carefully reviewed the record in this action and concludes that the decision of the administrative law judge is supported by substantial evidence and must therefore be affirmed.

It is therefore **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED** and that this action be **DISMISSED.**

If any party seeks review by the District Judge of this *Report and Recommendation,* that party may, within fourteen (14) days, file and serve on all parties objections to the *Report and Recommendation,* specifically designating this *Report and Recommendation,* and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1); F.R. Civ. P. 72(b). Response to objections must be filed within fourteen(14) days after being served with a copy thereof. F.R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de novo* review by the District Judge and of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *Smith v. Detroit Federation of Teachers,* 18 *Local 231 etc.,* 829 F.2d 1370 (6th Cir. 1987); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

Date: January 24, 2012                 *s/Norah McCann King*
                                        Norah McCann King
                                        United States Magistrate Judge